CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
December 10, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SAUER CONSTRUCTION, LLC, f/k/a SAUER INCORPORATED  Plaintiff/Counterdefendant, | |
| v. | Civil Action No. 7:23-cv-00193 |
| QBE INSURANCE CORPORATION, Defendant, and | By: Elizabeth K. Dillon  Chief United States District Judge |
| MC3 SOLUTIONS, LLC, Defendant/Counterclaimant/ Third-Party Plaintiff | |
| v. | |
| BONITZ, INC., Third-Party Defendant. | |

## MEMORANDUM OPINION

The claims in this case arise from contracts related to the construction of a production office lab at the Radford Army Ammunition Plant (the Project). Plaintiff Sauer Construction, LLC (Sauer) contracted with BAE Systems Ordnance Systems, Inc. to complete the Project and served as its general contractor. Sauer sub-contracted with MC3 Solutions Inc. (MC3) to perform some of the work on the Project. MC3, in turn, contracted with third-party defendant Bonitz, Inc. (Bonitz) to install resinous epoxy flooring.

In its second amended complaint against MC3, Sauer alleges that MC3 performed deficiently and did not perform in a timely fashion, causing delays on the Project and damages to Sauer. (*See generally* 2nd Am. Compl., Dkt. No. 51.) MC3 filed a counterclaim and also a third-party complaint against Bonitz. In its first motion to dismiss, Bonitz raised several grounds for dismissal, but the court found it necessary to rule only on one. Specifically, the court

reasoned that MC3's third-party complaint was not derivative of Sauer's complaint—which did not mention flooring as a problem with MC3's contract performance—and thus it was not proper under Rule 14. (*See generally* Mem. Op., Dkt. No. 49.)

Subsequent to the court's ruling, Sauer filed a second amended complaint with defendants' written consent, against the same defendants. (Dkt. No. 51.) MC3 again filed an Answer and Counterclaim against Sauer (Dkt. No. 54) and a separate third-party complaint against Bonitz (Dkt. No. 56). Currently pending before the court is Bonitz's second motion to dismiss the second amended complaint (Dkt. No. 63), which MC3 opposes.[1] The motion is fully briefed, was argued before the court, and is ripe for resolution. For the reasons set forth herein, the court will grant in part and deny in part the motion to dismiss.

## I. BACKGROUND

Sauer entered into a subcontract with MC3 to complete certain work on the Project. (2nd Am. Compl. ¶ 11, Dkt. No. 51; *see also* Dkt. No. 1-1 (copy of the Sauer-MC3 Subcontract).) The scope of work for that subcontract included pages of detailed tasks MC3 was to perform. The tasks fell into the following general categories, for which MC3 was to "furnish and install all . . . work": framing, drywall/gypsum board, paint/special coatings, resilient flooring/ceramic tile, resinous epoxy floor, acoustical ceilings, and millwork. (Sauer-MC3 Subcontract, Dkt. No. 1-1, at 20–25.)

Like its original complaint, Sauer's second amended complaint contains three claims: a breach of contract claim and claim for indemnity against MC3 (Counts 1 and II, respectively) and a claim for a breach of the performance bond against defendant QBE Insurance Corp., the surety. The second amended complaint contains additional language, however, making clear that

---

[1] Sauer has taken no position on the motion.

2

the resinous epoxy flooring was one of the problems with MC3's contract performance. First, Sauer specifically notes that part of the scope of work included "furnishment and installation of all resinous epoxy flooring." (2nd Am. Compl. ¶ 13.)

Moreover, the second amended complaint includes the following language:

> 17. Throughout the course of the Project, numerous issues arose with regard to MC3's work and performance under the Subcontract. These issues included: MC3's failure to supply sufficient skilled workmen and materials; failure to properly perform work with promptness and diligence; submission of inadequate submittals; and resultant delays to the critical path. ***These issues were experienced in connection with, without limitation, the resinous epoxy flooring scope of work.***
>
> 18. Sauer incurred significant costs attributable to MC3's deficient performance under the Subcontract and the delays caused by MC3. ***Much of these damages relate to and result from a failure to timely and properly complete the resinous epoxy flooring scope of work, which was, upon information and belief, subcontracted by MC3 to Bonitz, Inc.***

(*Id.* ¶¶ 17–18 (emphasis added).) Because of these amendments, the court finds that the third-party complaint is sufficiently derivative under Rule 14.[2] Thus, that basis—the sole one given by the court previously—no longer supports dismissal.

MC3's counterclaim (Dkt. No. 54), which is contained within its Answer to the Second Amended Complaint, contains a single claim for breach of contract. (*Id.* at 9–10 (seeking "at least $209,731.08" in damages against Sauer plus interest, legal fees, and court costs).) MC3's amended third-party complaint (Dkt. No. 56) is brought against Bonitz. It contains four claims: (1) "contractual indemnity," (2) "equitable indemnity," (3) "implied contractual indemnity," and (4) "contribution and apportionment." (Am. 3rd-Party Compl. 4–7, Dkt. No. 56.)

---

[2] Bonitz does not argue to the contrary.

## II.  DISCUSSION

### A.  Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).[3]  Here, Bonitz does not challenge the third-party complaint as factually insufficient.  Instead, its challenges are to the legal viability of MC3's claims.

### B.  Bonitz's Arguments for Dismissal[4]

In its supporting memorandum, Bonitz sets forth four main arguments, some with sub-parts.

Its first argument is that none of the three types of indemnification are ripe for adjudication (contractual, implied, equitable) because indemnity is only available where there has been an adjudication of the liability of the party seeking indemnity.  Thus, the argument goes, the indemnity claims are not ripe and must be dismissed.  At oral argument, counsel for Bonitz essentially withdrew this argument, agreeing with MC3 that Virginia Code Ann. § 8.01-

---

[3] Unless otherwise noted, the court omits internal citations, alterations, and quotation marks throughout this opinion.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[4] The contract between MC3 and Bonitz does not have a choice-of-law provision.  Because the court is sitting in diversity, it applies Virginia's choice-of-law rules, which provide that the nature, validity, and interpretation of a contract are governed by the law of the place where the contract was "made."  *Lexie v. State Farm Mut. Auto. Ins. Co.*, 469 S.E.2d 61, 63 (Va. 1996).  In Virginia, a contract is "made" at the place "where the final act is done which is necessary to make the contract binding."  *Hunter Innovations Co. v. Travelers Indem. Co. of Ct.*, 753 F. Supp. 2d 597, 602–03 (E.D. Va. 2010) (citations omitted).  The parties here do not identify where that last act occurred, but even if it occurred elsewhere, it is undisputed that the contract was performed in Virginia.  Virginia's choice-of-law rules for contract claims further direct that if a contract is made in one jurisdiction but performed in another, the law of the place of performance governs the contract.  *Id.* at 603 (citations omitted).  Consistent with these rules, and as both parties do, the court will apply Virginia law.

281(A) changed the common law and technically makes the indemnification claims ripe.[5] Thus, the court does not address this argument further. Although it is not clear from the hearing transcript whether Bonitz's concession extended to the contribution claim,[6] the court finds no reason to distinguish between the two, particularly where the relevant statute mentions both. *See* § 8.01-281(A); *see also* Va. Code Ann. § 8.01-249(5) (stating that actions for contribution or indemnification accrue "when the contribute or the indemnitee has paid or discharged the obligation," but noting that "[a] third-party claim permitted by subsection A of § 8.01-281 and the Rules of Court may be asserted before such cause of action is deemed to accrue"). Thus, the court will not dismiss any of the claims solely on the grounds that MC3's liability has not yet been determined or that there has not yet been a recovery by MC3.

Bonitz's remaining three arguments are as follows:

1. The contractual indemnity claim is void for additional reasons, such as:

    a. An indemnity claim is void where it purports to shield a contractor for liability from its own negligence. The indemnification provision here shields MC3 from claims except those arising from its own "misconduct" but does not expressly exclude negligence; thus, the contractual provision is void on its face. Alternatively, if the court finds that the exclusion for claims arising from MC3's misconduct "sweeps in all claims arising from its own negligence, rendering the provision enforceable, then misconduct should also include breach of contract—in which case the exclusion applies."

    b. The contract's indemnification provision provides for indemnity only in instances of "damage or injury" to "property or person." Sauer's complaint does not allege

---

[5] As the court informed the parties at the hearing on this motion, it recently addressed a similar argument, although not in a written opinion. *See Grange Ins. Co. v. Manitowoc Foodservice, Inc.*, Case No. 7:23cv00214 (W.D. Va.), Dkt. No. 32. In *Grange Insurance*, the court denied a motion to dismiss an equitable indemnification claim, rejecting the same argument Bonitz asserted in its briefing.

[6] The court has reviewed a rough draft of the transcript to determine whether Bonitz also conceded that the *contribution* claim could be brought at this time, but it is not clear from the transcript. At the start of the hearing, the court inquired whether the only argument for dismissal of the contribution was that impleader was inappropriate under Rule 14. At that time, Bonitz argued that the contribution claim also should be dismissed on the grounds of prematurity. Later in the hearing, in the context of discussing indemnification, Bonitz conceded that those claims are not premature.

5

      injuries to property or person but seeks redress for "purely economic losses." Thus, the indemnification clause is inapplicable.

2. Additional reasons exist to dismiss claims for implied indemnification and equitable indemnification:

   a. The equitable indemnification and implied indemnification claims in Counts 2 and 3, respectively, cannot be brought alongside the existing, albeit invalid, express indemnification provision. (Mem. Supp. 2nd Mot. Dismiss 15–16, Dkt. No. 64; *see also* Bonitz Reply 15 n.4, Dkt. No. 68 (arguing the same as to equitable indemnification, albeit only in a footnote).)

   b. MC3's claim for implied contractual indemnity also fails because there are no "unique factors" or "special relationship" as required by the Fourth Circuit for such a claim to lie, nor does the Third-Party Complaint even plead the existence of unique factors or a special relationship.

3. Allowing MC3 to implead its claims against Bonitz thwarts the purposes of impleader under Rule 14 and would not serve judicial economy; instead, it would "confuse the issues and delay the case."

(*See* Mem. Supp. Mot. Dismiss 2nd Third-Party Compl. (Bonitz Mem.) 2–3, Dkt. No. 64.)

MC3's responses are discussed in context below.

## C. Impleader Is Permissible and Proper Under Federal Rule of Civil Procedure 14.

The court begins with Bonitz's last argument because, if the court were to determine that impleader were improper under Rule 14, it would be unnecessary to reach Bonitz's other arguments.

Rule 14 provides, in relevant part, that "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1). The basic goal of Rule 14 is "to permit additional parties whose rights may be affected by the decision in the original action to be joined and brought in so as to expedite the final determination of rights and liabilities of all interested parties in one suit." *Dishong v. Peabody Corp.*, 219 F.R.D. 382, 385 (E.D. Va. 2003).

District courts have discretion to deny impleader if introduction of a third party "will introduce unrelated issues and unduly complicate the original suit . . . ." *Id.*; *see also Duke v. R.F.C.*, 209 F.2d 204, 208 (4th Cir. 1954) (recognizing that decisions to grant or deny impleader are reviewed for abuse of discretion); *Lehman v. Revolution Portfolio LLC*, 166 F.3d 389, 393 (1st Cir. 1999) (explaining that whether to permit a third-party complaint "is left to the informed discretion of the district court, which should allow impleader on any colorable claim of derivative liability that will not unduly delay or otherwise prejudice the ongoing proceedings"). The decision turns primarily on judicial economy, and Bonitz argues that judicial economy would not be served by allowing impleader.

The court views this as a close question. On the one hand, allowing the third-party complaint would allow for a determination, in one case, as to who is responsible for the failures on the Project as to the resinous epoxy flooring and as to which contractor(s) owe the other contractors what for that portion of the Project. On the other hand, it is also true that allowing the third-party complaint will complicate and potentially prolong this case, at least to some degree. Indeed, Bonitz states that it intends to file counterclaims against MC3 and possibly bring in one of its own sub-contractors if the third-party complaint survives. (Bonitz Mem. 17.)[7] Moreover, the facts involved between MC3 and Bonitz are more limited than the overall dispute between Sauer and MC3 and involve only a portion of the damages sought. Thus, Bonitz will likely incur some additional cost to participate in this lawsuit.

In support of its assertion that the court should deny impleader based on notions of judicial efficiency, Bonitz largely relies on two cases: *Allstate Ins. Co. v. Structures Design/Build, LLC*, No. 7:15-CV-00354, 2016 WL 1071040 (W.D. Va. Mar. 17, 2016), and

---

[7] Whether Bonitz is permitted to interplead its own sub-contractor, of course, would be subject to the same analysis under Rule 14.

7

*Johnson v. M.I. Windows & Doors, Inc.*, No. 2:11-CV-0167, 2012 WL 1015798, at *4 (D.S.C. Mar. 23, 2012). The court finds both distinguishable.

It is accurate, as Bonitz notes, that the *Allstate* court dismissed a third-party complaint, citing "judicial economy and fairness." 2016 WL 1071040, at *8. But the primary concern of the *Allstate* court—and the primary reason for disallowing the third-party complaint—was that the third-party claim was not derivative. Specifically, the plaintiff Allstate had alleged that PJ Little, a subcontractor and one of the defendants, negligently installed an improper connector to a hot water system. PJ Little sued CMC Supply, who had sold PJ Little the connector, alleging that the connector itself was defective. PJ Little asserted that a conforming connector would not have failed. In determining that the interpleader of PJ Little did not serve judicial economy, the court found it significant that the complaint and third-party complaint alleged different factual predicates and were factually inconsistent. The complaint alleged negligent installation, while the third-party complaint alleged a defective part. The court also noted that PJ Little had not shown that the parties were "joint tortfeasors" or that it had a right to indemnity or contribution from CMC Supply. Ultimately, then, the court found it inappropriate to use Rule 14 not only because it would not serve judicial economy, but primarily because the claim was not derivative. Here, after the allegations in the amended complaint, Bonitz appears to concede—or certainly no longer argues to the contrary—that the claim against it is derivative of the claims in the complaint. Thus, *Allstate* does not control the outcome here.

Similarly, in *Johnson v. M.I. Windows & Doors, Inc.*, No. 2:11-CV-0167, 2012 WL 1015798, at *3 (D.S.C. Mar. 23, 2012), the court severed the third-party complaint after concluding that the third-party claim was not derivative. That case is thus distinguishable on that ground alone. Moreover, the *Johnson* court went on to note that the underlying facts did not

8

significantly overlap and that there was likely to be significant discovery regarding class certification issues, issues which did not involve the third-party defendants.  *Id.* at *3–*4.

The other case relied upon by Bonitz is *Dishong*, *supra*.  There, the court found that the claims in the complaint and the third-party complaint would require entirely different factual evidence, such that "[v]irtually none of the evidence would overlap" and there was only one witness in common.  219 F.R.D. at 387.

In contrast, although the evidence involving Bonitz's alleged negligence or breaches will only constitute a portion of the evidence likely to be presented by Sauer, there is likely to be significant overlap in witnesses with knowledge about what occurred with regard to the flooring.  Moreover, unlike in *Allstate*, where there were two different types of allegations between the complaint and third-party complaint (one of negligent design and installation and one of a product defect), the allegations here all involve the negligence of the persons installing the flooring.  The court therefore finds that neither Rule 14 nor judicial economy requires the court to disallow the third-party complaint.

Having determined that allowing impleader here is otherwise appropriate, the court turns to the specific arguments raised by Bonitz as to specific claims.  The court has now rejected the only arguments Bonitz has offered for dismissing the "contribution and apportionment" claim (Claim 4).  *See supra* n.6.  Thus, that claim survives the motion to dismiss and will be permitted to go forward.

**D. The contractual indemnity claim is void because it purports to require Bonitz to indemnify MC3 for its own negligence.**

The next issue before the court is whether the contractual indemnification clause is void because it purports to shield MC3 from its own negligence, which would violate Virginia law.  The provision at issue reads as follows:

9

> 10. Contractor [MC3] shall not in any manner be liable for any loss, damage, or injury, direct or consequential and whether or not occasioned by inevitable accident, to property or person that may occur to or in relation to the work, **not caused by its own misconduct**, and Subcontractor [Bonitz] shall indemnify and hold Contractor harmless on account of any claim or claims with respect thereto which may be asserted against Contractor, provided, however, that in the event of any such claim Contractor shall at the expense of Subcontractor have the right to settle or defend any such claim through counsel selected by Contractor. Contractor shall have the right to require Subcontractor to furnish to Contractor an indemnity bond with surety satisfactory to Contractor, covering Subcontractor's undertaking set forth in this paragraph.

(Dkt. No. 25, at 2 (emphasis added).)

The court must determine whether the foregoing provision is void pursuant to Virginia Code Ann. § 11-4.1, which applies to construction and certain other contracts. In relevant part, it provides:

> Any provision . . . by which the contractor performing such work purports to indemnify or hold harmless another party to the contract against liability for damage arising out of bodily injury to persons or damage to property suffered in the course of performance of the contract, caused by or resulting solely from the negligence of such other party or his agents or employees, is against public policy and is void and unenforceable.

Va. Code Ann. § 11-4.1.

Bonitz argues that misconduct is narrower than negligence. Because the contract only carves out misconduct, its argument continues, the provision could require Bonitz to indemnify MC3 for MC3's own negligence, which would violate Virginia Code Ann. § 11-4.1. MC3 counters that "misconduct" is broad enough to include negligence and thus that Section 10 of the Contract does not require Bonitz to indemnify MC3 for its own negligence and is enforceable.

For the reasons discussed next, the court agrees with Bonitz. In particular, the court finds that there are at least some types of negligence that would fall outside of "misconduct," and thus

10

the carve-out for MC3's "misconduct" does not eliminate the possibility that the indemnification provision purports to allow MC3 to obtain indemnification for its own negligence.

Neither party cites any case directly on point, where the word "misconduct," standing alone in a contract, has been interpreted to either exclude or include negligence. In its opening brief, Bonitz cites two cases on this issue, and MC3 focuses in its opposition on distinguishing them. The first case is *Uniwest Construction, Inc. v. Amtech Elevator Servs., Inc.*, 699 S.E.2d 223, 230 (Va. 2010), *withdrawn in part on other grounds*, 714 S.E.2d 560 (Va. 2011). In *Uniwest*, the contract expressly included indemnification for negligence. It said the other party agreed to indemnify Uniwest "whether or not such claim(s) are based upon the negligence of Uniwest." *Id.* at 441–42. Thus, the provision quite clearly included indemnification for negligence, and the Supreme Court of Virginia easily concluded it was invalid because it violated § 11-4.1. Here, there is no express inclusion of negligence. So, *Uniwest* is not particularly helpful.

The second case is *Hellas Constr., Inc. v. Bayside Concrete, Inc.*, No. 2:18cv553, 2019 WL 10982495 (E.D. Va. Mar. 12, 2019). There, the primary indemnification clause did not contain an exclusion at all and thus *would* include negligence. But several of the subparagraphs discussing specific indemnification obligations excluded indemnification for Hellas' "sole negligence." *Id.* at *4. The court reasoned that this language did not save the indemnification provision because those provisions could still require indemnification for contributory negligence. *Id.* Neither of these cases is exactly on point, although *Hellas* suggests that unless a provision excludes all types of negligence, it will be deemed invalid.

The court's own research led to a case from the Supreme Court of Virginia that used both terms—negligence and misconduct—without distinguishing them, when discussing

11

indemnification.  But it was not construing "misconduct" in a contract, nor did it expressly equate the two terms.  Citing to an 1890 case, it said the following:

> We [held] the release provision to be void to the extent that it "stipulates for exemption from liability even for the consequences of the [railroad] company's own negligence ... [and] precludes a recovery by the plaintiff, whether the company was negligent or not." [*Johnson Adm'x v. Richmond & Danville R.R. Co.*, 11 S.E. 829, 830 (Va. 1890)]. We stated that to "uphold the stipulation in question, would be to hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct; which can never be lawfully done where an enlightened system of jurisprudence prevails. Public policy forbids it, and contracts against public policy are void." *Id.*

*Estes Exp. Lines, Inc. v. Chopper Exp., Inc.*, 641 S.E.2d 476, 479 (Va. 2007).[8]

Finding no controlling authority on the issue, the court begins instead with general principles of contract interpretation.  Virginia directs courts to interpret contract language in accordance with the intention of the parties "gleaned from the words they have used in the document."  *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354 (Va. 2019).  The judicial interpretation should conform to the plain meaning that reasonable parties likely would have attributed to the words.  *Id.* at 355.  The court must consider the context and the entirety of the contract in interpreting different terms, but a "clear and unambiguous" term must be taken in its plain, ordinary, and popular sense.  *Id.* (citations omitted).  When "the plain meaning is undiscoverable," or conflicting interpretations are reasonable, then a court should construe the contract against the drafter of the ambiguous language.[9]  *Id.* at 355–56.  Here, Bonitz asserts— and MC3 does not dispute—that MC3 drafted the parties' contract.  (Reply Br. 8.)

---

[8] Neither party cites or discusses *Estes Express Lines* or the *Johnson* case cited therein.

[9] Another judge of this court has recognized that Virginia Code Ann. § 11-4.1, which is an exception to the general public policy allowing broad freedom to contract, must be "construed narrowly."  *RSC Equip. Rental, Inc. v. Cincinnati Ins. Co.*, 54 F. Supp. 3d 480, 485–86 (W.D. Va. 2014).  Unlike in that case, where the court was determining whether the statute applied to a particular type of contract, this case does not require the court to construe the statute; only the parties' contract.

Based on the language of the provision, and a standard, common meaning of "misconduct," Bonitz has the stronger argument. Merriam-Webster Online provides three definitions: "1: mismanagement especially of governmental or military responsibilities; 2: intentional wrongdoing specifically: deliberate violation of a law or standard especially by a government official; MALFEASANACE 3 a: improper behavior b: ADULTERY." *Misconduct*, https://www.merriam-webster.com/dictionary/misconduct (last visited Dec. 9, 2024). The court also notes the section of the definition described as a legal definition, which states that misconduct is "intentional or wanton wrongful but usually not criminal behavior." *Id.*

Simple negligence, by contrast, is contrasted with intentional torts and does not require intentional conduct. *Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005) (citations omitted) (recognizing that "any form of negligence" is a different "kind" of liability than "willful and wanton conduct, reckless conduct, or intentional misconduct"). Put differently, intentional conduct is *not* negligence. *See id.*

In its opposition, MC3 points out that the first and third of those three dictionary definitions—"mismanagement" and "improper behavior"—do not necessarily require intent. It contends that both of those definitions "are broad enough to encompass negligence," looking in turn to their dictionary definitions. For example, mismanage includes "to manage (something) wrongly or poorly" and "improper" has a number of definitions which include "not in accord with propriety, modesty, good manners, or good taste;" and "not in accord with fact, truth, or right procedure: Incorrect." *Mismanage*, https://www.merriam-webster.com/dictionary/mismanage (last visited Dec. 9, 2024); *Improper*, https://www.merriam-webster.com/dictionary/improper (last visited Dec. 9, 2024).

13

But the court also must look at the overall tenor of the misconduct definition. For example, in the same portion of the definition where it says, "improper behavior," it refers to adultery. One does not commit adultery through negligence. And the first definition (and the "legal" one, which parties might attempt to use in a contract), certainly suggests (or requires) more than negligence.

At the very least, the term "misconduct" is ambiguous as to whether it would include *all* negligence. As such, and because MC3 is the drafter, the provision must be construed against it. *Erie Ins. Exch.*, 822 S.E.2d at 355–56. So construed, the court easily concludes that there is at least some negligent conduct that would not fall within the term "misconduct." An accident resulting from negligence does not fall within any of the typical definitions of "misconduct." Misconduct also does not seem to encompass negligence by omission, *i.e.*, breaching a duty by failing to do something.

Also, as Bonitz points out in its reply (Reply at 5–6), elsewhere in the contract MC3 did use the term "negligence," so it knew how to do so. (*See* Contract 3, Dkt. No. 56-1 (explaining that each Subcontractor must be responsible for its own equipment, materials, and vehicles when utilized or stored on site and is "liable for damage to the Owner's property resulting from subcontractor's negligent acts or omissions during the execution of the work should the subcontractor cause such damages"). During oral argument, counsel for MC3 emphasized that this provision serves an entirely different purpose and relates to Bonitz's duties to the owner, not to MC3. True enough, but the point remains that MC3 used the term negligence in that provision and used "misconduct" in the indemnification provision at issue.

The court also finds it significant that in at least several other contexts, Virginia treats misconduct differently than negligence. For example, in *Borbas v. Virginia Employment*

14

*Commission*, 440 S.E.2d 630, 631 (Va. Ct. App. 1994), the court reasoned that the term "misconduct" in the context of the unemployment statute would not include "behavior which is involuntary, unintentional[,] or the product of simple negligence." Instead,

> an employee is guilty of "misconduct connected with his work" when he *deliberately* violates a company rule reasonably designed to protect the legitimate business interests of his employer, or when his acts or omissions are of such a nature or so recurrent as to manifest a *willful disregard* of those interests and the duties and obligations he owes his employer.

*McNamara v. Va. Empl. Comm'n*, 681 S.E.2 67, 72 (Va. Ct. App. 2009) (emphasis added) (quoting *Branch v. Va. Empl. Comm'n*, 249 S.E.2d 180, 182 (Va. 1978)).

Similarly, in Virginia regulations providing for complaints against contractors, there is a list of prohibited actions that includes—in *separate* sections—"negligence or incompetence in the practice of contracting," 18 Va. Admin. Code 50-22-260(B)(5), and "misconduct in the practice of contracting," *id.* § 50-22-260(B)(6). That suggests that the two are distinct types of acts. Otherwise, there would be no need to include both, especially in different sections.

In sum, the court is convinced that misconduct and negligence are different concepts, and that negligence is broader than misconduct. The court relies primarily on (1) the dictionary definitions of misconduct, which tend to imply primarily intentional actions, coupled with the fact that MC3 drafted the contract and ambiguities must be construed against it; (2) the fact that MC3 used the term "negligence" elsewhere in the contract, and (3) *Hellas*'s strict requirement that *all* negligence be excluded from indemnification for the provision to be valid.

Because the court concludes that the contractual indemnity clause violates Virginia Code Ann. § 11-4.1, that clause is void. Because the court's ruling on this issue is dispositive of the

15

contractual indemnity claim, it does not reach the other challenges Bonitz raises to the contractual indemnity claim.[10]

### E. The Express Indemnity Claim Does Not Mean That the Implied Indemnity and Equitable Claim Must Be Dismissed.

The remaining two indemnification claims are implied indemnification and equitable indemnification. In Virginia, "[i]mplied indemnification must . . . arise from an underlying contractual relationship between the parties." *Int'l Fid. Ins. Co. v. W. Va. Water Auth.*, Civil Action No. 7:11-cv-00441, 2012 WL 5364196, at *2 (W.D. Va. Oct. 30, 2012). But an implied indemnity claim is available only when "unique factors or a special relationship between the parties give rise to such a right." *TransDulles Ctr. Inc. v. USX Corp.*, 976 F.2d 219, 228 (4th Cir. 1992).

An equitable indemnity claim requires a plaintiff to prove that, despite having no "personal fault," it is "nevertheless legally liable for damages caused by the negligence of another." *Carr v. Home Ins. Co.*, 463 S.E.2d 457, 458 (Va. 1995) (citations omitted). In that circumstance, the innocent-yet-liable party can then "recover from the negligent actor for the amounts paid to discharge the liability." *Id.* (citations omitted)

Bonitz argues that where a contract contains an invalid express indemnification provision, it is inappropriate to allow, even in the alternative, either an implied indemnification or an equitable indemnification claim. Basically, Bonitz contends that MC3 had an opportunity to draft an indemnification provision and it drafted an invalid one; as a result, MC3 cannot now rely on implied or equitable indemnity.

---

[10] In particular, the court does not address Bonitz's alternative argument that if "misconduct" encompasses negligence, it also is broad enough to encompass a breach of contractual provisions, and so MC3's breach, if any, is excluded from indemnification. The court also does not address Bonitz's argument that the damages alleged by Sauer are outside the scope of the indemnification clause.

16

In its opening memorandum, Bonitz cites to an absence of law allowing an implied indemnification claim in the face of an invalid express claim. Similarly, Bonitz's reply notes the Fourth Circuit's pronouncement that "resort to implied indemnity principles is improper when an express indemnification contract exists." (Bonitz Reply 15, Dkt. No. 68 (quoting *Fid. & Deposit Co. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983)).) *Accord D.C. Water & Sewer Auth. v. Samaha Assocs., PC*, Civil No. 23-01328-BAH, 2024 WL 1540336, at *4 (D. Md. Apr. 9, 2024) (applying Maryland law and summarizing that "[g]enerally, an implied right of indemnification is inappropriate when a contract contains an express indemnification provision"); *Collier v. Land & Sea Rest. Co., LLC*, 972 F. Supp. 2d 870, 877 (W.D. Va. 2013) (finding "unpersuasive" and unable to "find any authority" for the proposition that claims for contractual and equitable indemnity can co-exist). But *District of Columbia Water & Sewer Authority* also noted that some courts allow implied indemnification claims to proceed alongside contractual indemnification claims. 2024 WL 1540336, at *4.

Notably, moreover, none of the foregoing cases involved a case where an express provision was invalid—effectively meaning there was no valid contractual indemnity provision—and then the court also disallowed implied or equitable indemnification. Bonitz has failed to present any authority for the proposition that, where an express provision exists but is found to be invalid, no implied or equitable indemnification will lie. And at the hearing, counsel admitted that it could find no such authority. Nor has the court's research disclosed any.

Here, of course, the court has already concluded that the express claim is invalid; thus, there effectively is *not* a contractual indemnification provision. That alone likely renders much of the authority in the preceding paragraph inapplicable. Moreover, MC3's other indemnification claims are pled in the alternative to its contractual claim. In short, and in the

17

absence of any controlling authority compelling a different result, the court will not dismiss either the implied or equitable indemnification claims on this basis.

**F. The implied indemnification claim must be dismissed because the third-party complaint does not plausibly allege "unique factors" or a "special relationship" between MC3 and Bonitz.**

As the parties agree, where a written contractual relationship exists, "implied rights to indemnity may be read into contracts only when unique factors or a special relationship between the parties give rise to such a right." *Int'l Fid. Ins. Co. v. W. Va. Water Authority*, No. 7:11-cv-00441, 2012 WL 5364196, at *2 (W.D. Va. Oct. 30, 2012) (cleaned up) (quoting *TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219, 228 (4th Cir. 1992)). MC3 contends that its contract with Bonitz "is a federal contract that incorporates federal regulations and statutes," which it claims is sufficient to allow implied indemnification. (MC3's Opp'n 13, Dkt. No. 67.) Bonitz responds that this is simply a "basic services contract" that is being performed at a federal site, and it discusses in detail the authorities cited by MC3 in its response. (*See* Bonitz's Reply 13–15.) MC3 also points to the fact that the contract includes a retainage provision, but Bonitz counters that retainage provisions are usually standard in commercial construction contracts and that alone would not give rise to a sufficiently "special relationship."

The court has carefully reviewed the briefing and considered the parties' arguments, and it concludes that Bonitz has the stronger argument on this issue. The overall trend in cases (and especially subsequent to the two of the cases relied upon by MC3—*General Elec. Co. v. Moretz*, 270 F.2d 780 (4th Cir. 1959), and *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124 (1956)) is to *limit* implied contractual indemnification. In *Wingo v. Celotex Corp.*, 834 F.2d 375, 378 (4th Cir. 1987)), for example, the Fourth Circuit distinguished both *Moretz* and *Ryan* and declined to find implied indemnification. *See also Banker Steel Co., LLC v. Hercules*

*Bolt Co., Inc.*, No. 6:10cv00005, 2011 WL 1752224, at *11–12 (W.D. Va. May 6, 2011) (declining to find implied indemnification in case arising in construction context and collecting authority for same). In short, establishing "unique factors" or a "special relationship" is a fairly high bar, and MC3 cannot clear that bar on the alleged facts here. Thus, the court will dismiss the implied indemnity claim.

### III.  CONCLUSION

For the reasons set forth above, the court will grant in part and deny in part Bonitz's motion to dismiss the Amended Third-Party Complaint. It will dismiss the claims for contractual indemnification and implied indemnification. It will permit the claims for equitable indemnification and for contribution and apportionment to proceed. An appropriate order shall be entered.

Entered: December 10, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge